## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

| | |
|---|---|
| ANISE MARC, individually and on behalf of all others similarly situated, | CASE NO. |
| Plaintiff, | 2:16-CV-579-FLM-99MRM |
| vs. | CLASS ACTION COMPLAINT |
| UBER TECHNOLOGIES, INC.; RASIER, LLC; and DOES 1-50, inclusive | INJUNCTIVE RELIEF SOUGHT |
| Defendants. | AND DEMAND FOR JURY TRIAL |

### CLASS ACTION COMPLAINT

Plaintiff ANISE MARC, by and through undersigned counsel, brings this action on behalf of herself and all other individuals who have worked or are currently working in the State of Florida as drivers for Defendants, Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber") and for her Class Action Complaint, alleges as follows:

### INTRODUCTION

1.     This case is about thousands of hard-working drivers struggling to get by while Uber, a company valued at more than *$50 billion*, exploits them to bolster its bottom line. Uber's drivers – like Plaintiffs and the Class they represent – are the lifeblood of the company. Nonetheless, Uber uses its position of power to mislead and take advantage of its drivers at every turn for the purpose of driving profits and nothing more.

1

2.      Uber refuses to pay its drivers a living wage. After accounting for drivers' expenses, which Uber should—but does not—pay, most drivers barely make enough money to make ends meet. Moreover, to further squeeze its drivers, Uber routinely misappropriates money from their fares and shirks its financial commitments.

3.      Uber falsifies and misclassified the employment status of its drivers. Though Uber exercises near complete control over its drivers and many of its drivers work the equivalent of two fulltime jobs for Uber, it classifies drivers as "independent contractors," rather than "employees." Uber does this in an attempt to claim its drivers are subject to the protections of the Florida State Labor Law, and therefore Uber does not have to pay higher wages and benefits.

4.      Uber misrepresents how drivers are paid as pure profit motive at the expense of its drivers. Uber tells customers that gratuity is included in the fares charged when they use Uber's electronic payment service. In reality, Uber fails to remit the gratuity to its drivers.

5.      Plaintiff also seeks to recover damages for Uber's: (a) tortious interference with prospective business relations; (b) breach of contract; (c) promissory estoppel; (d) unjust enrichment; (e) conversion; (f) unfair competition; (g) fraud; and (h) failure to pay minimum wage as required by Florida's Minimum Wage Act, Title XXXI, Ch. 440, *et. seq.,* and 448.110 *et. seq.*

## PARTIES

6.      Plaintiff Anise Marc is a citizen and resident of Naples, Collier County,

Florida. Plaintiff currently works for Defendant Uber as an UberX driver.

7.      Defendant, Uber Technologies, Inc. is a Delaware corporation headquartered

in San Francisco, California.[1] Uber's principal place of business is located at 1455 Market

Street, San Francisco, California. Uber is authorized to conduct business and does conduct

business throughout Florida, including in Collier County. It provides a service where

individuals can login to a software application on their smartphone, request a ride, and be

paired with an available driver. *See* https://www.uber.com/.

8.      Defendant, Rasier, LLC, a Delaware limited liability company, is a subsidiary

of Uber Technologies, Inc. and is its equivalent for purposes of this action. Raiser's principal

place of business is located at 1455 Market Street, San Francisco, California.[2] Upon

information and belief, the members of Rasier, LLC are Axel Martinez, Karen Walker, and

---

[1] Memorandum of Law in Support of Defendants' Motion to Dismiss or, In the Alternative, to Transfer Venue at 3 and 15, *Yucesoy v. Uber Technologies, Inc., et al*, No. 1:14- cv-03938-FDS (D. Mass. Oct. 28, 2014), ECF No. 7 (explaining of itself that "Uber is a software technology company organized under Delaware law and maintains its principal place of business in California" and that ". . . Uber maintains its principal place of business in California and the majority of corporate witnesses and evidence is located in California.") (attached hereto as **Exh. A**). *See also*, California Secretary of State, Business Entity Detail for Uber Technologies, Inc.,  (July 20, 2016), http://kepler.sos.ca.gov/ (attached hereto as **Exh. B**). Uber, then, based on its own admission was incorporated in Delaware and maintains its principal place of business in California

[2] "Defendants admit that Raiser is a subsidiary of Uber." *Fisher v. Uber Technologies, Inc., et al.*, No. 2:15-cv-01787-TSZ (W.D. Wash. Nov. 20, 2015), ECF No. 5 (attached hereto as **Exh. C**). "Rasier, a Delaware LLC, is a wholly-owned subsidiary of Uber." *Ogunmokun, et al. v. Uber Technologies, Inc., et al.*, No.  (E.D. N.Y. Oct. 29, 2015), ECF No. 4  (attached hereto as **Exh. D**). "Defendant Rasier LLC is a Delaware corporation with its principle place of business in California." Notice of Removal of Civil Action at 1, *City of Portland v. Uber Technologies, Inc., et al.*, No. 3:14-cv-01958-SI (Dist. of Or. Dec. 8, 2014), ECF No. 1 (attached hereto as **Exh. E**).

Travis Kalanick, all residents of San Francisco, California.[3] It is authorized to conduct business and does conduct business throughout Florida, including in the Middle District of Florida.

9.      At all relevant times, Uber was an "employer" within the meaning of all applicable statutes.

10.     At all relevant times, the work performed by Plaintiffs and similarly situated employees was directly essential to the business operated by Defendants.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2) (diversity jurisdiction) and the Class Action Fairness Act, in that (i) there is complete diversity (Plaintiff is citizen of Florida and Defendants are incorporated in Delaware and otherwise maintain their principal places of business in California), (ii) the amount in controversy exceeds $5,000,000.00 (Five Million Dollars) exclusive of interests and costs, and (iii) there are 100 or more members of the proposed Plaintiff Class.

12.     Defendants conduct substantial business in Florida and have sufficient contacts with Florida or otherwise intentionally avail themselves of the laws and markets of Florida, so as to sustain this Court's jurisdiction over Defendants.

---

[3] Rasier LLC, in its Application for Registration of a Foreign LLC filed with the Arizona Corporation Commission, listed Travis Kalanick of 182 Howard Street #8, San Francisco, California 94105, as "manager" and Uber Technologies Inc. of the same address as "member." Application for Registration of a Foreign LLC, Arizona Corporation Commission, at http://ecorp.azcc.gov/Details/Corp?corpId=R18749500 (accessed on July 21, 2016) (attached hereto as **Exh. F**). Axel Martinez and Karen Walker are listed as managers of Rasier LLC with the same address as Uber's Market Street principal place of business listed above. Washington Secretary of State, Business Entity Detail for Rasier LLC (January 18, 2016), http://www.sos.wa.gov/corps/search_detail.aspx?ubi=603335087 (attached hereto as **Exh. G**).

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this claim occurred in this District, and Defendants are subject to personal jurisdiction in this District.

## STATEMENT OF FACTS

### A.     Plaintiff Anise Marc

14.     Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Because Uber misclassifies its drivers as independent contractors, Plaintiffs had to pay expenses, including gas, tolls, cleaning, car repairs and lease payments, from their portion of the fare.

15.     Uber also deducts a $1 "safe ride" fee from each fare which is allegedly used to pay for background checks, driver safety education and development of safety features in its mobile application – an expense the employer should pay, not the employee.

16.     In December of 2013, Plaintiff Anise Marc began working for Uber as an UberX driver. Plaintiff stopped working for Uber, also in December of 2013 approximately 10 days later. When given the option to "opt-out" of Defendants' proposed arbitration clause, Plaintiff timely did opt out of the arbitration clause via an email from Plaintiff to Uber.

17.     On average, Plaintiff drove approximately 8-10 hours per day every day she worked for Uber.

18.     Plaintiff was compensated approximately $400, including expenses, such as gas, tolls, lease payments, and car repairs.

19.     After expenses, Plaintiff made an approximate income of $3 per hour.

**B.** **Uber Increases its Profits by Deceiving its Drivers**

20. Uber routinely misappropriates money from its drivers' fares. Specifically, Uber deducts a $1 "safe ride" fee from each fare, which is allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application—an expense that Uber, the employer, should pay.

21. Uber routinely reneges on its financial commitments to its drivers. For instance, Uber's contract provides that drivers must be compensated $5.00 for cancelled fares, but Uber failed to compensate Plaintiff for a majority of cancelled fares. Uber also told Plaintiff that he would receive a credit card that would entitle them to a discount for fuel; however, no card was ever provided.

22. Uber routinely misleads its drivers regarding the amount of money that they can earn. For example, Uber told Plaintiff that drivers can earn guaranteed money working at a certain time. However, Plaintiff did not earn the guaranteed hourly pay that Uber promised its drivers could earn.

**C.** **Uber Increases its Profits by Misappropriating its Drivers' Tips**

23. During the course of her employment, Plaintiff did not receive tips.

24. Uber told customers, on its website and in marketing materials, that gratuity is included in the total cost of the fare for the car service and that there is no need to tip the driver:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file — there's no need to tip.

25.     Uber intentionally misrepresented to customers that gratuity was included in the cost of its fares and thus instructed passengers not to leave a tip in addition to the amount of the fare.

26.     Through its training video, Uber also misrepresented to Plaintiff and other drivers that tips would be added to their wages. Uber told them not to ask for or accept tips because passengers would tip based on service by selecting a percentage on the Uber application, and the tips would be passed on to them.

27.     Despite Uber's misrepresentations to customers that "there's no need to tip" and misrepresentations to Plaintiff and other drivers that tips would be added to their wages, Plaintiff and other drivers did not receive their gratuities.

28.     As a result of Uber's misrepresentations to customers that gratuity is included in the cost of its service and there is no need to tip drivers, Plaintiff and other Uber drivers have been deprived of payments to which they are entitled.

**D.     Uber Misclassifies its Drivers**

29.     Uber uniformly misclassifies its drivers, including Plaintiff, as independent contractors when they are employees.

30.     Uber is involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring drivers' performance (including disciplining or terminating those who fail to meet standards), and setting prices.

31.     Uber exercises substantial control over the qualification and selection of its drivers. Before working for Uber, applicants must complete Uber's application process,

including a background check, city knowledge exam, vehicle inspection, and personal interview.

32.     Uber also unilaterally sets the fares for all rides, and drivers are required to charge the cost determined solely by Uber. Uber then bills customers for the entire amount before remitting a portion of the fare to its drivers. Uber pays its drivers weekly.

33.     Uber exercises considerable control and supervision over the work details of its drivers—the manner, methods, and means of its drivers' provision of transportation services. For example, upon signing an agreement to work for Uber, new drivers must watch a video demonstrating how Uber wants them to interact with customers. Drivers are even instructed on such simple tasks as how to pick up a customer with their car. In short, Uber retains all necessary control over how its drivers are to perform their duties as well as their performance of those duties.

34.     Uber controls the instrumentalities of Plaintiff's job. Drivers cannot use a car that is more than ten years old and Uber controls its drivers' car registrations

35.     Uber monitors its drivers to ensure compliance with Uber's quality control standards. All drivers for Uber, including Plaintiffs, must maintain an average customer star evaluation of at least 4.5 out of a possible 5 stars. Instructions on how to improve one's star rating are given to drivers who fall below this average in any given week. If a driver fails to maintain an average customer rating of 4.5, Uber deactivates the driver's ability to use the application to pick up customers, an action tantamount to terminating the driver "at will," a hallmark of an employee-employer relationship. Thus, monitoring through rider ratings is an effective mechanism for Uber to enforce its standards.

36.     Many drivers work well over 40 hours per week for Uber.     For example, Plaintiff Anise Marc worked approximately 60 hours per week.

37.     Uber claims a proprietary interest in its riders, which further demonstrates that Uber acts as more than a mere intermediary between riders and drivers.  For instance, Uber prohibits its drivers from answering rider queries about booking future rides outside the Uber application or otherwise soliciting Uber riders.

38.     As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiff and other similarly aggrieved driver employees with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments).   Uber also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiff and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service.

## CLASS ACTION ALLEGATIONS

39.     This action is properly maintainable as a class action pursuant to the Federal Rules of Civil Procedure ("F.R.C.P.") Rule 23.

40.     Plaintiff seeks to proceed as a class action on behalf of herself and the following class of persons:

> **All individuals who are currently working for or who have worked for Defendants as drivers within the State of Florida.**

41.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by

amendment or amended complaint. Excluded from the Class are Defendants and its affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies, its affiliates, employees, officers, agents, and directors in their governmental capacities; any judicial officer presiding over this matter and the members of their immediate families and judicial staff; and class counsel.

42.     The Class members are readily ascertainable. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants. The number and identity of the Class members are determinable from the records of Defendants.

43.     At all relevant times, Plaintiff and Class members are and have been similarly situated, have had substantially similar job requirements and pay provisions, and are and have been subjected to Defendants' decisions, policies, plans, programs, practices, procedures, protocols, routines, and rules, all culminating in willful wage and hour violations.

44.     The proposed Class is so numerous that a joinder of all members is impracticable, and the disposition of their claims as a class will benefit the parties and the court. Although the precise number of such persons is unknown, the facts on which the calculation of that number are presently within the sole control of Defendants, upon information and belief, there are more than forty (40) members of the Class.

45.     Plaintiff's claims are typical of those claims, which could be alleged by any member of the Class, and the relief sought is typical of the relief, which would be sought by each member of the Class in separate actions. All the Class members were subject to the same corporate practices of Defendants, as alleged herein. Defendants' corporate-wide

policies and practices affected all Class members similarly, and Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries and damages arising from the same unlawful policies, practices and procedures.

46.     Plaintiff is able to fairly and adequately protect the interests of the Class and has no interests antagonistic to the Class. Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual members of the Class, establishing incompatible standards of conduct for Defendants and resulting in the impairment of Class members' rights and the disposition of their interests through actions to which they were not parties.

47.     There are questions of law and fact common to the Class which predominate over any questions affecting only individual class members, including but not limited to:

      a.  Whether Defendants have charged customers a gratuity for class members' services;

      b.  Whether Defendants failed to distribute the total proceeds of those gratuities to the class members;

      c.  Whether Defendants have informed customers that gratuity is included in the price of the Uber service and so there is no need to tip the drivers;

      d.  Whether class members have suffered damages based upon        Uber's representation to customers that there is no need to tip the drivers;

      e.  Whether Defendants improperly classified class members as independent contractors rather than employees;

f.  Whether class members have been required to pay the expenses of their employment, including the cost of a vehicle, repairs, gas and tolls;

g.  Whether Uber unlawfully denied to compensate its employees, Uber's drivers, those expenses; and;

h.  Whether class members were denied employee benefits as required by law.

48.  The representative and their chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this complaint so as to be able to assist in its prosecution. In addition, the representative's attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class. Furthermore, the resources available to counsel ensure that the litigation will not be hampered by a lack of financial capacity. Plaintiff's attorneys have sufficient financial resources and are willing to absorb the costs of the litigation

## COUNT I
## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS

49.  Plaintiff readopts and incorporates by reference all allegations contained in the preceding paragraphs 1 through 48 of this Complaint as though fully set forth herein.

50.  Uber interfered with the continuing business relationship between drivers and riders—a separate relationship from that between either Uber and its drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to drivers, including Plaintiff, absent Uber's interference.

51.     Uber intentionally and maliciously interfered with Plaintiffs and other drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

52.     For example, Uber specifically advertises to its customers that tips are included in the cost of the fare:

DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file — there's no need to tip.

53.     In reality, Uber collected gratuities and then failed to remit them to drivers.

54.     Based on its past practices of not remitting gratuities to drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to its drivers.

55.     Were it not for Uber's misrepresentations regarding gratuities, riders would have left a tip for drivers as is customary in the car-service industry.

56.     Uber knew that this would be a benefit accruing to the drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

57.     Uber's conduct damaged Plaintiff and other drivers by depriving them of payments of gratuities to which they are entitled, and to which a reasonable customer would have expected them to receive.

## COUNT II
## BREACH OF CONTRACT

58.     Plaintiff readopts and incorporates by reference all allegations contained in the preceding paragraphs 1 through 57 of this Complaint as though fully set forth herein

59.     Uber has an implied contract with Plaintiff and other drivers to remit the total proceeds of all gratuities, as well as to reimburse for expenses.

60.     Plaintiff and other drivers are third-party beneficiaries of customers' implied contract with Uber that tips would be remitted to drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made on various webpages.  By entering into this agreement, customers intended to secure a financial benefit for drivers, including Plaintiff, in the form of gratuity and to act directly for the drivers' benefit.

61.     Uber withheld and continues to withhold gratuities and has not reimbursed employment related expenses in breach of their contract with plaintiff and other drivers.

62.     Uber contracted with Plaintiffs and other drivers to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $5.00 for cancelled fares.

63.     Uber has failed to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $5.00 for cancelled fares, all of which is a breach of their contract with plaintiff and other drivers. .

64.     As a result of Uber's breach of contract Plaintiff and other drivers  have suffered monetary damages

14

## COUNT III
## VIOLATION OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT
## FLORIDA STATUTES §§ 501.201 *et seq.*

65.     Plaintiff readopts and incorporates by reference all allegations contained in the preceding paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (FDUTPA).  The stated purpose of this Act is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." *Id.* §501.202(2).

67.     Plaintiff and all Class members are "consumers" and the transactions at issue in this Complaint constitute "trade or commerce" as defined by FDUTPA. *See id.* § 501.203(7)-(8).

68.     FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." *Id.* § 501.204(1).

69.     In violation of FDUTPA, Defendants employed fraud, deception, false promise, misrepresentation, and the knowing concealment, suppression, or omission of material facts in its treatment or classification of Uber drivers in the State of Florida.

70.     Defendants acted willfully, knowingly, intentionally, unconscionably, and with reckless indifference when it committed these acts of consumer fraud.

71.    Defendants routinely, willfully, knowingly, intentionally, and/or with reckless indifference, mislead their drivers regarding fees that are deducted from fares and fees that drivers will allegedly receive from fares but do not receive in actuality.   Specifically, Uber deducts a $1 "safe ride" fee from each fare, which drivers are told is acceptable under the law and use used  to  pay  for background checks, driver safety education, and development of safety features in its mobile application. However, in reality this fee is an expense that Uber, the employer, should pay. Uber also represents to its drivers that they are deemed under applicable labor laws as independent contractors, when they should legally be deemed employees. Furthermore, Uber routinely  reneges on its financial commitments to its drivers.  For instance, Uber's contract provides that drivers must be compensated $5.00 for cancelled fares, but Uber failed to compensate Plaintiff for a majority of cancelled fares. Uber also  told Plaintiff that she would receive a credit card that would entitle them to a discount for fuel; however, no card was ever provided. Uber also told Plaintiff that she would receive tips in her wages, however she did not.

72.    Defendants willfully, knowingly, intentionally, and/or with reckless indifference, its drivers regarding the amount of money that they can earn. For example, Uber told Plaintiff that drivers can earn guaranteed money working at a certain time. However, Plaintiff did not earn the guaranteed hourly pay that Uber promised its drivers could earn.

73.    At the time Defendants promised to Plaintiff and other members of the Class would receive such benefits and compensation, Defendants knew or reasonably should have

known that such promises were not true. Plaintiff and other members of the Class reasonably relied on Defendants' promises to the detriment of Plaintiff and the Class.

74.     Said acts and practices on the part of Defendant were and are illegal and unlawful pursuant to Florida Statutes § 501.204.

75.     As a direct and proximate result of Defendant's FDUTPA violations, Plaintiff and the Class members have been injured and are entitled to compensatory damages, including but not limited to the difference in value between the Shingles as delivered and as they should have been delivered, as well as equitable relief, punitive damages, costs, and reasonable attorney's fees.

### COUNT IV
### UNJUST ENRICHMENT

76.     Plaintiff readopts and incorporates by reference all allegations contained in the preceding paragraphs 1 through 75 of this Complaint as though fully set forth herein

77.     Defendants unlawfully retained gratuities and cancellation fees owed to Plaintiffs and other drivers and did not reimburse expenses.

78.      Defendants obtained these benefits from Plaintiff and drivers by making material misrepresentations and taking advantage of Plaintiff and drivers.

79.     As a result, Defendants have been unjustly enriched through their retention of gratuities owed to the drivers as well as expenses.

80.     Plaintiff and the class members are entitled to restitution for their full share of the proceeds of the improperly retained gratuities and expenses.

### COUNT V
### CONVERSION

81.     Plaintiff readopts and incorporates by reference all allegations contained in the preceding paragraphs 1 through 80 of this Complaint as though fully set forth herein.

82.     Plaintiff and members of the Class had the right to possession of tips, surge fares, cancellation fees and money spent for expenses.

83.     Defendants unlawfully took Plaintiff's and Class Members' personal property without Plaintiff's and Class Members' permission and retained the property for its own benefit.

84.     As a result, Plaintiff and members of the Class were harmed and are entitled to restitution for their full share of proceeds, as well as treble damages.

## COUNT VI
## FRAUD AND MISREPRESENTATION

85.     Plaintiff readopts and incorporates by reference all allegations contained in the preceding paragraphs 1 through 84 of this Complaint as though fully set forth herein.

86.     Defendants made a material representation of fact, that Plaintiff would receive gratuities, which was untrue, which Defendants knew was an untrue statement, with the intent to deceive, which Plaintiffs justifiably relied upon, causing Plaintiff to incur damages.

87.     Defendants also informed Plaintiff and proposed class members that they would receive a cancellation fee refund if a passenger cancelled, which Defendants knew was an untrue statement at the time, with the intent to deceive, which Plaintiff justifiably relied upon, causing Plaintiff to incur damages.

88.     Defendants made a material representation of fact, that Plaintiff would receive a card for discounted gas, which Defendants knew was an untrue statement at the time, with

the intent to deceive, which Plaintiff justifiably relied upon, causing Plaintiff to incur damages.

89.     Plaintiff and other drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was their employer and the party responsible for overseeing the payment of these monies.

**COUNT VII**
**VIOLATIONS OF FLORIDA STATE LABOR LAW**

90.     Plaintiff readopts and incorporates by reference all allegations contained in the preceding paragraphs 1 through 89 of this Complaint as though fully set forth herein.

91.     Despite the existence of an agreement indicating Plaintiffs are independent contractors, the treatment of Plaintiff and control exercised by Uber indicate that Plaintiffs are employees.

92.     Accordingly, Uber's actions violate Florida's Minimum Wage Law, Title XXXI, Ch. 448, Section 110 *et seq*.

93.     As a result of Uber's violations, Plaintiff is entitled to recover the wages and benefits withheld in violation of Florida State Labor Law as well as attorneys' fees pursuant to Title XXXI, Ch. 448, Section 8 and Section 104. In addition, Plaintiff seeks the imposition of penalties on the Defendant Uber with respect to the applicable provisions of Florida State Labor Law.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed class, requests relief against each Defendant as follows:

a.  An award of damages, including compensatory, punitive, and treble damages, as well as back pay, in an amount to be determined at trial;

b.  Notice to the Classes of the action;

c.  An injunction against Defendants prohibiting Defendants from engaging in each of the unlawful practices, policies and patterns set forth herein;

d.  Liquidated damages, including back pay;

e.  Reasonable attorneys' fees and costs of this action;

f.  Pre-judgment and post-judgment interest as provided by law; and

g.  An Order requiring that Defendants return to Plaintiff any gratuities and any other funds wrongfully kept by Defendants;

h.  Such other and further relief that the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: July 14, 2016

*/s/ Jordan L. Chaikin*
Jordan L. Chaikin (Florida Bar No. 878421)
CHAIKIN LAW FIRM, PLLC
12800 University Drive, Suite 600
Fort Meyers, FL 33907
Telephone: 239.470.8338
Fax: 239-433-6836
Jordan@chaikinlawfirm.com

*Trial Counsel*

Charles E. Schaffer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, PA 19106-3697
Telephone: 215.592.1500
Facsimile: 215-592.4663
cschaffer@lfsblaw.com

Charles J. LaDuca (subject to *pro hac vice* admission)
CUNEO GILBERT & LADUCA, LLP
8120 Woodmont Avenue, Suite 810
Bethesda, MD 20814
Telephone: 202.789.3960
Facsimile: 202.789.1813
charlesl@cuneolaw.com

Michael McShane (subject to *pro hac vice* admission)
S. Clinton Woods (subject to *pro hac vice* admission)
AUDET & PARTNERS, LLP
711 Van Ness Avenue, Suite 500
San Francisco, California 94102-3229
Tel.: 415.568.2555
Fax: 415.568.2556
mmcshane@audetlaw.com
cwoods@audetlaw.com

*Counsel for Plaintiffs*